# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **FRANCISCO VIGIL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00159 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Francisco Vigil, Pro Se Plaintiff; Nancy Hull Davidson, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Francisco Vigil, a state prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Vigil asserts constitutional challenges to certain classification procedures that allegedly prevented him from earning his release from the highly restrictive segregation conditions at Red Onion State Prison ("Red Onion") in Pound, Virginia. He seeks monetary damages and injunctive relief.[1] After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted.

---

[1] Since filing this action, Vigil has been transferred to a prison in Colorado. The defendants have not argued that his request for injunctive relief is moot. Because Vigil is still committed to state custody, and because there is no indication in the record to the contrary, I find that there is a reasonable expectation that he could be returned to the Virginia prison system in the future. I therefore will not dismiss the request for injunctive relief as moot. *Cf. Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam) (stating that review of an inmate's claim for injunctive relief is permissible where "(1) the challenged action was in its duration too short to be fully litigated prior to its

Vigil is serving a Colorado state court sentence of life without parole for a conviction of first degree murder, with additional sentences for convictions for kidnapping and assault. Vigil was one of ten offenders received by Red Onion from the Colorado Department of Corrections ("CODOC") on June 29, 2014.

Red Onion and its sister facility, Wallens Ridge State Prison ("Wallens Ridge"), house all Virginia Department of Corrections ("VDOC") "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[2] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 9-34, ECF No. 29-1.) This OP became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive

---

cessation or expiration, and (2) there was a reasonable expectation that the same complaining party could be subjected to the same action again").

[2] According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (*See* OP 830.2 (IV)(G)).

based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges.

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

-3-

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive.

> Intensive Management (IM):
> IM-0
> IM-1
> IM-2
> IM-SL6
> Special Management (SM):
> SM-0
> SM-1
> SM-2
> SM-SL6
> Step-Down—Level VI General Population
> Structured Living—Phase 1 and Phase 2
> Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the

*Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells. Per policy, they receive meals in their cells (the same types of meals that inmates in general population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have two twenty-minute phone calls per month, one one-hour, non-contact visit per week, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM inmate may earn under OP 830.A at IM-1 and IM-2 include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities. An inmate progressing to SM-1 or SM-2 can earn even greater privileges.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step.

Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods

geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. (*Id.*)

Inmates in the SL6 step-down pod may progress through two phases.[3] In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. (*Id.*) Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, they have outside recreation with other inmates for an hour, twice a week, and they can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway. If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to the lowest security level for an IM status inmate: Level 6-IM, also known as the Closed Pod. The Closed Pod is expressly designed "to create an

---

[3] In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing. The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

opportunity for an increased quality of life for offenders possibly facing a long term in high security."[4]  (OP 830.A(IV)(G)(1).)  Closed Pod inmates continue to have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts.  Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) requires that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the Institutional Classification Authority ("ICA").  (OP 830.1, at 35-43, ECF No. 29-1.)  According to OP 830.A, Appendices F and G, Level S inmates are to receive an ICA review at least every ninety days.  Among other things, the ICA reviews and acts on recommendations for step increases or reductions.

---

[4]  OP 830.A(IV)(G)(2)(g) states:

Restricted freedoms and interaction with staff and other offenders for the IM population is temporary.  There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population.  The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others.  However, at the time of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence.  Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G), all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access.

Vigil and the Colorado inmates received at Red Onion in 2014 were confined under segregation status pending review by the ICA. Defendants' evidence is that after an ICA proceeding on September 29, 2014, with Vigil present, officials recommended his assignment to IM-0. Vigil denies that he was present for this hearing. Thereafter, the ICA reviewed Vigil's assignment regularly and, by April 2015, had advanced him to IM-2. In August 2015, the ICA recommended that Vigil remain at IM-2, but it noted that he would be reviewed for advancement to "D6," the IM Closed Pod, at the next Dual Treatment Team meeting. (Barksdale Aff. Enclosure H, at 62, ECF No. 29-1.) In mid-June 2016,

Vigil notified the court that, after several temporary transfers to prison facilities in Virginia and Colorado, he had reached his "permanent" Colorado facility on June 13, 2016. (ECF No. 32.)

Liberally construed, Vigil's verified § 1983 Complaint and amendments[5] assert claims that application of OP 830.A to assign him to IM status unfairly prolonged his confinement under segregation conditions without federally required procedural protections, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that those conditions themselves violated the Eighth Amendment's prohibition against cruel and unusual punishment. Vigil sues VDOC administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP 830.A without sufficient due process. Vigil seeks monetary damages and injunctive relief abolishing OP 830.A and making IM inmates eligible for transfer to a lower security prison and general prison population conditions.

---

[5] Vigil has filed an Amended Complaint (ECF No. 11) and a motion that I construe as a Motion for Leave to File a Supplemental and Amended Pleading (ECF No. 24) that I will grant. Therefore, I will include here allegations and information from these amended and supplemental pleadings.

In Vigil's Amended Complaint and other submissions, he alleges that officials arbitrarily assigned him to IM status without allowing him to be present or offer contradictory testimony, witnesses, or evidence, with no available appeal; that they wrongfully assigned him to IM status, despite his medium security classification and years without disciplinary infractions in Colorado;[6] that reviews between the various IM and SM steps did not follow VDOC due process policies and were not meaningful, consisting of a counselor and a lieutenant stepping to his door to ask if he has a statement; that OP 830.A discriminates against IM inmates, who suffer a much more restrictive environment than inmates in other forms of administrative segregation; that IM status permanently prevents an inmate from working his way out of segregated confinement at Red Onion by completing the *Challenge Series*, while SM status inmates who complete the same series can work their way to general population; and that assignment to IM status is arbitrary, since many SM inmates allegedly have more serious convictions and disciplinary records than some IM inmates.

Vigil alleges that "[i]inmates are . . . discriminately placed on IM status, because they are colored, with [sic] other inmates with equal or even worse

---

[6] A Red Onion counselor allegedly told Vigil that one factor for his assignment to IM status was a Colorado disciplinary conviction for attempted escape. Vigil contends that this minor infraction had garnered him nothing more serious than a thirty-day loss of privileges and should not have qualified him for IM status. The defendants have also stated that Vigil was classified to IM status because of the seriousness of his convictions. Vigil states that his crimes occurred in 1998 when he was sixteen years old.

records, who are white, are placed on SM status." (Pl.'s Mem. Opp'n Summ. J. 10, ECF No. 31.) He also alleges that officers made offensive racist remarks in the IM housing area, such as calling him "Spick" or referring to "White Power" while making a Nazi salute. (Pl.'s Mem. Opp'n Summ. J. Ex. 15, at 24, ECF No. 31-1.)

In several submissions, Vigil complains about living conditions he experienced as an IM inmate. He alleges that for 73 days, he had no privileges except one telephone call per month. He also alleges that officials denied him "faith property" for 191 days. (First Am. Compl. ¶ 13, ECF No. 11.) He left his IM cell only for brief showers three times a week and for outside recreation five hours per week in a thirty-foot-tall metal cage with a plastic top through which he could see the sky. He allegedly had no educational or vocational opportunities, only limited job possibilities within the pod while shackled to a chair in handcuffs, and only non-contact visits. The cell had only a bunk bed, a table with no seat, a toilet and sink combination unit, a shelf for his hygiene items, and a window with a view of the pod, not the outdoors. Once per week, an officer would give him a sponge dipped in cleaning solution to clean his cell. Vigil also had no control over the bright lights in the cell, which prison staff dimmed only between 10:00 p.m. and 5:45 a.m. The cell door had a security box and seals around it to discourage communication. Whenever an inmate left his cell, he was required to undergo a strip search, be handcuffed behind his back, and be shackled.

-12-

The defendants have filed a Motion for Summary Judgment, supported by copies of OP 830.A, its charts of IM and SM requirements, and its progress report forms. They also present the affidavit of Red Onion Warden Earl Barksdale, which describes these and other relevant procedures as well as Vigil's progress through the step-down procedures.

## II.

### A. Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

I must draw all reasonable inferences from the facts in favor of Vigil, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.

-13-

1991).  However, Vigil cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

### B.  Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  "To state a procedural due process violation,[7] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Vigil does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification.

---

[7]  Vigil expressly states that he is not pursuing a claim that OP 830.A violates his substantive due process rights.  In any event, such a claim would fail.  It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Thus, Vigil's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015).

-14-

*Id.* at 221-22. A state-created liberty interest may exist, however, if Vigil (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Vigil makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Vigil is challenging, not his classification to Level S, but rather, his classification to IM status instead of SM status under OP 830.A and the subsequent classification adjustment decisions within those two pathways. He apparently believes that these procedures stood in his way of being released sooner from segregation to general population conditions. The defendants agree that OP 830.A "creates an expectation that 'S' level offenders will receive reviews of their classification status." (Defs.' Mem. Supp. Summ. J. 22, ECF No. 29.) Specifically, OP 830.A(IV)(K)(5) and Appendices F and G provide that the ICA will review inmates every ninety days and decide whether to advance them to the next status level in the step-down procedures. I conclude that this periodic review policy creates a potential liberty interest for Vigil in being released from the restrictive conditions of his current security classification. *See Incumaa v. Stirling*,

-15-

791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic classification reviews for segregation inmates created potential liberty interest).

I must next determine if Vigil's continued confinement in the various segregation classifications within the OP 830.A categories imposed "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by Virginia law for an inmate like Vigil, who is serving a life sentence imposed in another state. Given Vigil's transfer to Red Onion from a lower security level prison in Colorado, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected

perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485;

*Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a

prisoners' [sic] location, variations of daily routine, changes in conditions of

confinement (including administrative segregation), and the denial of privileges —

matters which every prisoner can anticipate are contemplated by his original

sentence to prison — are necessarily functions of prison management that must be

left to the broad discretion of prison administrators to enable them to manage the

prisons safely and efficiently"). It is well established that a temporary assignment

to segregated confinement — thirty days or even six months, with reduced

privileges, few out-of-cell activities or socialization opportunities, and heightened

security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S.

at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months

under conditions dictated by administrative segregation policies was not atypical

under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the

safety of guards and prison personnel, the public, and the prisoners themselves."

*Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial

discretion to devise reasonable solutions to the problems they face" in maintaining

prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct.

1510, 1515 (2012).

-17-

Most importantly, the Supreme Court has consistently employed a due process analysis that encourages prisons to implement written management policies while minimizing the involvement of the federal courts "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact."[8] *Wilkinson*, 545 U.S. at 214.

---

[8] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living

-18-

Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in *Incumaa* was subjected to "a highly intrusive strip search every time he [left] his cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once

---

conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

Case 7:15-cv-00159-JPJ-RSB   Document 34   Filed 09/27/16   Page 19 of 30   Pageid#: 356

initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process provided no clear criteria for him to become suitable for release from the supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

Without question, inmates classified to Level S within the VDOC are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in full restraints and with dual escorts. Vigil asserts that out-of-cell movement also involves a visual strip search. The mere existence of these conditions in Red Onion's IM status housing areas, however, does not render confinement there atypical or significantly harsh, because general

population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

Vigil contends that the conditions imposed under OP 830.A are atypical and significant, particularly IM status, because it is allegedly permanent. However, Vigil's own classification history belies this claim, because he did not remain at IM-0 status. In less than a year, he progressed to the less restrictive steps of IM-1, IM-2, and consideration for the Closed Pod. In so doing, he earned additional privileges and was ultimately transferred back to Colorado.

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to

-21-

lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Vigil alleges that an inmate's assignment to IM or SM is random and sometimes based on illegitimate factors. I conclude that the team assessment approach and the multi-level, internal and external classification review procedures built into OP 830.A and the other VDOC policies protect against any inmate's long-term, wrongful classification to a step more restrictive than warranted. Moreover, if Vigil believed that procedural errors or miscalculations occurred during a classification proceeding, he could have protested the decision through the Offender Grievance Procedure, OP 830.1(IV)(G), or filed a request for an interim review of his classification based on procedural or calculation errors. (*See* OP 830.1(IV)(E).)

Vigil fails to state facts showing that his IM status makes him ineligible for parole or good conduct time. It is uncontroverted that his Colorado sentence is life *without* parole. Even if he could prove parole eligibility, I find no provision in OP 830.A itself that revokes an inmate's eligibility for discretionary parole consideration. Parole board members may, legitimately, consider an inmate's Level S classification, or his particular subclassification under OP 830.A, as a

-22-

reflection of disciplinary problems and other behavioral issues that signal his unsuitability for parole release.

Vigil also fails to state facts indicating that his IM status assignment, rather than his disciplinary record or other factors, caused the alleged loss of his ability to earn good conduct time. I find no evidence in the record that this classification inevitably affects the length of an inmate's confinement so as to trigger a separate, constitutionally protected liberty interest in avoiding that classification. *Sandin*, 515 U.S. at 487.

For the reasons stated, I find no material fact in dispute on which Vigil can establish that his confinement at Red Onion under OP 830.A was atypical and significantly harsh compared to conditions contemplated by his sentence. Conditions there, while restrictive, are set up to improve in defined stages based on Vigil's own efforts toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Vigil has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection, such as a

-23-

formal ICA hearing, is *constitutionally* required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Vigil also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures themselves. Vigil raises complaints about the procedures used to assign him to IM status, the alleged lack of evidence to support his IM status, and officials' failure to give notice and hearing rights as required by VDOC policies. Such actions are, at most, alleged violations of the OP 830.A policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Vigil's claims that one or more of them violated his constitutional rights by changing his classification under OP 830.A without due process. I will grant the Motion for Summary Judgment on Vigil's due process claims accordingly.

Case 7:15-cv-00159-JPJ-RSB   Document 34   Filed 09/27/16   Page 24 of 30   Pageid#: 361

## C. Equal Protection.

The Equal Protection Clause[9] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." *Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Vigil does not state facts supporting these necessary elements of his equal protection claim.

First, Vigil has not demonstrated that he was similarly situated to inmates in SM status when officials classified him to IM-0 status. He was transferred to Red

---

[9] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Onion from another state, had received a life sentence for murder, and had a disciplinary offense of past attempted escape. All these facts reasonably triggered security concerns for VDOC officials pending assessment of his current attitudes and behavior for the appropriate housing assignment. Thus, officials could also lawfully treat him differently in the initial classification decisions from other segregation inmates with histories of less serious, violent, or recent disciplinary convictions within the VDOC system.

Second, Vigil does not show that he has been treated differently than any other inmate during periodic reviews for step changes. Neither Vigil nor any other Level S inmate will change his step status under OP 830.A merely by avoiding disciplinary convictions and being polite. A step change requires his progress on the *Challenge Series* curriculum and the classification officers' recognition that he is working to make positive changes in his thinking and behavior. Moreover, Vigil's steady progress, from IM-0 to IM-1 to IM-2 to consideration for the Closed Pod, demonstrates that officials were not purposely discriminating against him or otherwise holding him back from working his way toward eligibility for lower step-down levels.

Third, while the OP 830.A step-down procedure purposefully treats SM and IM status inmates differently, these differences are rationally related to legitimate

governmental purposes.[10]  Namely, this procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety."  OP 830.A(I).  The logical connections between the policy's provisions and the furtherance of its legitimate penological goals are self-evident. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

For the stated reasons, I find no material dispute of fact on which Vigil could prove an equal protection violation here.  Therefore, I conclude that the defendants

---

[10]  Vigil has alleged that officials at Red Onion are mostly white and that "colored" inmates were assigned to IM status, while white inmates "with equal or even worse records" were assigned to SM status.  (Pl.'s Mem. Opp'n Summ. J. 10, ECF No. 31.)  Specifically, he mentions two white VDOC inmates sent to segregation — one for an escape attempt and one for stabbing another inmate — who were assigned to SM status.  He also mentions a white Colorado inmate who was advanced to SM status.  While allegations of race discrimination may be actionable under § 1983, Vigil's conclusory accusations, based on anecdotes alone, are insufficient to state an actionable claim that the IM/SM assignments for these inmates, or any others, were motivated by race.  *See Chapman v. Reynolds*, 378 F. Supp. 1137, 1140 (W.D. Va. 1974) (noting that "[a] claim of racial discrimination is a grievous charge, which certainly can rise to constitutional dimensions" but holding that "the court will not look behind the determinations of prison officials on mere accusations that they are racially motivated").

Vigil also alleges that and that he and other inmates overheard officers making racially offensive remarks.  Allegations of verbal abuse and harassment by guards, without more, do not state any constitutional claim.  *Henslee v. Lewis*, 153 Fed. App'x 179, 180 (4th Cir. 2005) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)); *see also Keyes v. City of Albany*, 594 F. Supp. 1147, 1155 (N.D.N.Y. 1984) (holding that "the use of vile and abusive language," including racial epithets directed at the plaintiff and his children, "no matter how abhorrent or reprehensible, cannot form the basis for a §1983 claim").

Case 7:15-cv-00159-JPJ-RSB   Document 34   Filed 09/27/16   Page 27 of 30   Pageid#: 364

are entitled to summary judgment as a matter of law and will grant their motion on this claim.

## D. Eighth Amendment.

Vigil's final challenge to OP 830.A asserts that his status under OP 830.A offends the prohibition against cruel and unusual punishment of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant

physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Vigil's allegations do not show that he suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. Vigil does not allege that he was deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about higher levels of restraint and fewer privileges. He fails to allege that these restrictions have caused him any serious or significant harm. For the stated reasons, I find no material dispute of fact on which Vigil could prove his claim that he was subjected to unconstitutionally cruel conditions while at Red Onion. Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment concerns.

III.

For the reasons stated, I conclude that Vigil's constitutional challenges to OP 830.A are without merit, and the defendants are entitled to summary judgment as a matter of law. It is accordingly **ORDERED** that the plaintiff's Motion for Leave to File a Supplemental and Amended Pleading (ECF No. 24) is GRANTED; but the defendants' Motion for Summary Judgment (ECF No. 28) as to the Complaint as amended and supplemented is GRANTED.

A separate judgment will be entered herewith.[11]

ENTER:   September 27, 2016

/s/  James P. Jones
United States District Judge

_____

[11]     It is also **ORDERED** that all claims against the defendant identified as the Dual Treatment Team are DISMISSED as legally frivolous, pursuant to 28 U.S.C. § 1915A(b)(1). This defendant is not a "person" subject to suit under § 1983. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989). In any event, for the reasons stated, Vigil has stated no actionable § 1983 claim against any of the individual members of this team.

-30-